# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOEL DOE, a minor; by and through his Guardians JOHN DOE and JANE DOE; MARY SMITH; JACK JONES, a minor; by and through his Parents JOHN JONES and JANE JONES; and MACY ROE,<br><br>      Plaintiffs,<br><br>      vs.<br><br>BOYERTOWN AREA SCHOOL DISTRICT; DR. RICHARD FAIDLEY, in his official capacity as Superintendent of the Boyertown Area School District; DR. BRETT COOPER, in his official capacity as Principal; and DR. E. WAYNE FOLEY, in his official capacity as Assistant Principal,<br><br>      Defendants. | **Case No. 17-1249-EGS**<br><br>**The Honorable Edward G. Smith**<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>**ORAL ARGUMENT REQUESTED** |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Table of Authorities...............................................................................................iii

Introduction...............................................................................................................1

Facts..........................................................................................................................4

Argument...................................................................................................................9

I.    Plaintiffs Will Likely Succeed on the Merits.............................................. 10

  A.    The Policy Violates the Fundamental Right to Bodily Privacy from
        Persons of the Opposite Sex. ................................................................. 10

    1.    Our History and Tradition: We Actively Avoid Intimate Exposure,
          Especially for Our Children. ............................................................ 14

    2.    The Policy Infringes Plaintiffs' Fundamental Privacy Rights. ....... 18

    3.    The Policy Fails Strict Scrutiny. ..................................................... 25

  B.    The Policy Violates Title IX by Turning Locker Rooms, Showers,
        and Restrooms into Sexually Harassing Environments.......................... 27

II.   Plaintiffs Will Suffer Irreparable Harm Without an Injunction of the
      Policies. .......................................................................................................... 43

III.  The Balance of Hardships Sharply Favors the Plaintiffs................................. 44

IV.   The Public Interest Favors a Preliminary Injunction....................................... 45

V.    Plaintiffs Respectfully Request this Court Waive Bond Requirements
      Under Rule 65(c)............................................................................................. 45

Conclusion................................................................................................................46

Certificate of Service...............................................................................................48

# TABLE OF AUTHORITIES

## Cases

*Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014) ................. 44, 45

*Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 604 (6th Cir. 2005) ...................... 16

*Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 621 (3d Cir. 1992) ............. 12, 39, 40, 42

*Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008) ..................... 11

*Brooks v. ACF Industries, Inc.*, 537 F.Supp. 1122 (S.D. W.Va. 1982) .......................... 22

*Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751 (2014) .......................................... 10

*Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994) ........................................... 11, 16

*Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010) ................... 15

*City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094
    (5th Cir. 1981) ............................................................................................. 46

*City of Phila. v. Pa. Human Relations Comm'n*, 300 A.2d 97, 103
    (Pa. Commw. Ct. 1973) ............................................................... 16, 18, 21, 36

*Conestoga Wood Specialties Corp. v. Sec'y of the U.S. Dep't of
    Health & Human Servs.*, 724 F.3d 377, 382 (3d Cir. 2013) ....................... 10

*Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1323
    (7th Cir. 1993) ............................................................................................. 13, 16

*Crowley v. Local No. 82, Furniture & Piano Moving,
    Furniture Store Drivers, Helpers, Warehousemen, & Packers*,
    679 F.2d 978, 1000 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984) .. 46

*Dauven v. George Fox Univ.*, No. CV.09-305-PK, 2010 WL 6089077, at *13
    (D. Or. Dec. 3, 2010) ......................................................................................... 38

*Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) ..... 43

*Dejohn v. Temple University*, 537 F.3d 301, 316 n.14 (3d Cir. 2008).......... 27, 28, 35, 37

*Doe v. Luzerne County*, 660 F.3d 169, 175-76 n.5 (3d Cir. 2011) ........................ 2, 11, 38

*Doe v. Wood Cty. Bd. of Educ.*, 888 F. Supp. 2d 771 (S.D. W.Va. 2012)...................... 44

*Elrod v. Burns*, 427 U.S. 347, 373 (1976) .......................................................................... 43

*Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007) ......................... 24

*Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993)........................................................ 15

*Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993)............................................. 13

*G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079
   (6th Cir. 1994) ......................................................................................................... 45

*Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998).................................. 37

*Goins v. West Group, Inc.*, 635 N.W.2d 717 (Minn. 2001) ............................................... 25

*Groupe SEB USA, Inc. v. Euro-Pro Operating LLC,* 774 F3d 192, 205
   (3d Cir. 2014) ............................................................................................................ 44

*Harris by Harris v. Easton Pub. Co.*, 483 A.2d 1377, 1383 (Pa. Super. Ct. 1984) 39, 42

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)................................................... 35

*Hendricks v. Commonwealth*, 865 S.W.2d 332, 336 (Ky. 1993). ................................... 17

*Hoop Culture, Inc. v. GAP Inc.,* 648 F. App'x 981, 985 (11th Cir. 2016) ..................... 44

*Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 804 n.8
   (3d Cir. 1989) ............................................................................................................ 45

*Jeldness v. Pearce,* 30 F.3d 1220, 1228 (9th Cir. 1994)...................................................... 3

*Joelner v. Village of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004) ........................... 45

*Johnston v. University of Pittsburgh of Commonwealth System of Higher
Education*, 97 F. Supp. 3d 657, 668 (W.D. Pa. 2015)...................................................... 24

*Kline v. Security Guards, Inc.*, 386 F.3d 246, 260 (3d Cir. 2004) ................................. 39

*Koeppel v. Speirs*, 808 N.W.2d 177, 180 (Iowa 2011)........................................................ 39

*Koeppel v. Speirs*, No. 9-902 / 08-1927, 2010 Iowa App. LEXIS 25, at * 16
(Iowa Ct. App. Jan. 22, 2010)........................................................................... 12, 40, 41

*Kohler v. City of Wapakoneta*, 381 F. Supp. 2d 692, 704 (N.D. Ohio 2005)................ 40

*Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) ........................... 10

*Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981)........................................................ 13

*Lewis v. Triborough Bridge & Tunnel Auth.*, 31 F. App'x 746 (2d Cir. 2002)............. 31

*Livingwell, Inc. v. Pennsylvania Human Relations Com'n*, 606 A.2d 1287, 1289
(Pa. Commw. Ct. 1992) ................................................................................... passim

*McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*,
370 F.3d 275, 301–02 n. 25 (2d Cir.2004)...................................................... 44

*N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1228
(11th Cir. 2008) ................................................................................... 44

*New Jersey Div. of Youth & Family Servs. v. M.R.*, No. A-5931-11T3,
2014 WL 1977014, at *6 (N.J. Super. Ct. App. Div. May 16, 2014) ........................ 36

*Norwood v. Dale Maint. Sys., Inc.*, 590 F. Supp. 1410, 1415-16
(N.D. Ill. 1984)................................................................................... 22, 23, 32, 33

*People v. Grunau*, No. H015871, 2009 WL 5149857, *3
(Cal. Ct. App. Dec. 29, 2009) ................................................................... 16, 32

*Poe v. Leonard*, 282 F.3d 123, 136-39 (2d Cir. 2002) .................................................. 11

*Powelton Civic Home Owners Ass'n v. Dep't of Housing and Urban Development*,
284 F. Supp. 809, 840 (E.D. Pa. 1968) ........................................................ 46

*Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987).... 43

*Reno v. Flores*, 507 U.S. 292, 301-02 (1993) ................................................................ 23, 26

*Rider v. Pennsylvania*, 850 F.2d 982, 986 n.6 (3d Cir. 1988)........................................ 25

*Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 833 (10th Cir.1993) ...................... 44

*Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 375 (2009)....................... 13

*Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010)........................................................ 43

*Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 205-06
   (3d Cir. 2000) ........................................................................................... 27, 28, 35, 37

*Schonauer v. DCR Entm't, Inc.*, 905 P.2d 392, 401 (Wash. Ct. App. 1995) ................ 31

*Seiwert v. Spencer-Owen Cmty. Sch. Corp.*, 497 F. Supp. 2d 942, 954
   (S.D. Ind. 2007) .......................................................................................................... 38

*Sommers v. Budget Mktg., Inc.*, 667 F.2d 748, 748-50 (8th Cir. 1982) ........................ 25

*St. John's Home for Children v. W. Va. Human Rights Comm'n*,
   375 S.E.2d 769, 771 (Vir. 1988) ................................................................................ 15

*State v. Lawson*, 340 P.3d 979, 982 (Wash. App. 2014) ................................................. 15

*Torres v. Wis. Dep't of Health & Soc. Servs.*, 859 F.2d 1523, 1531 (7th Cir. 1988).... 23

*United States v. Raines*, 362 U.S. 17, 27 (1960)............................................................. 45

*United States v. Virginia*, 518 U.S. 515 (1996) ......................................................... 21, 22

*Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) .................................................... 13

*Washington v. White*, 231 F. Supp. 2d 71, 80-81 (D.D.C. 2002) .............................. 31, 32

*York v. Story*, 324 F.2d 450, 454-56 (9th Cir. 1963).................................................. 11, 12

**Statutes**

20 U.S.C. § 1681(a) ........................................................................... 27

28 U.S.C. § 1681(2) ........................................................................... 28

28 U.S.C. § 1681(8) ........................................................................... 28

28 U.S.C. § 1686 ............................................................................... 29

24 P.S. § 7-740 ........................................................... 14, 26, 38, 41

35 P.S. § § 672—680d ....................................................................... 14

43 P.S. § 109 ................................................................................... 14

18 Pa.C.S.A § 5901 ........................................................................... 17

18 Pa.C.S.A. § 3127 .......................................................................... 17

18 Pa.C.S.A. § 3127(b) ...................................................................... 17

18 Pa.C.S.A. § 6312 .......................................................................... 18

18 Pa.C.S.A. § 6321 .......................................................................... 18

18 Pa.C.S.A. § 7507.1 ....................................................................... 17

Act of Mar. 24, 1887, ch. 103, § 2, 1887 Mass Acts, 668, 669 ......................... 15

**Regulations**

34 C.F.R § 106.33 ........................................................................ 3, 17

34 C.F.R. §§106.32-106.33 ................................................................. 29

7 Pa. Code § 1.57 ............................................................................. 14

7 Pa. Code § 78.75 ........................................................................... 14

7 Pa. Code § 82.9 ............................................................................. 14

22 Pa. Code § 55.2 ....................................................................... 26, 41

22 Pa. Code § 57.2(a) ................................................................. 26, 41

22 Pa. Code § 59.34(a) ............................................................... 26, 41

25 Pa. Code § 171.16 ....................................................................... 14

25 Pa. Code § 171.7 ................................................................. 26, 38, 41

28 Pa. Code § 18.62 ......................................................................... 14

28 Pa. Code §19.21 .......................................................................... 14

28 Pa. Code § 205.38 ....................................................................... 14

28 Pa. Code Chapter 18 ................................................................... 14

31 Pa. Code § 41.121 ....................................................................... 14

31 Pa. Code § 41.122 ....................................................................... 14

31 Pa. Code § 47.127 ....................................................................... 15

34 Pa. Code § 403.28 ....................................................................... 15

43 Pa. Code § 41.24 ......................................................................... 15

43 Pa. Code § 41.31 ......................................................................... 15

43 Pa. Code § 41.32 ......................................................................... 15

## Other Authorities

117 Cong. Rec. 30407 (1971) ........................................................... 29

118 Cong. Rec. 5807 (1972) (Statement of Sen. Bayh) ....................... 29

9 *Oxford English Dict.* 578 (1961) ................................................... 29

A. Larson, Employment Discrimination Sex § 14.30 (3d Ed. 1980) ............. 21

*American Heritage Dict.* 1187 (1976) ................................................................................. 29

American Psychological Association. *Answers to your questions about transgender people, gender identity, and gender expression.* 1-2 (2011), *available at* http://www.apa.org/topics/lgbt/transgender.aspx ........................ 3, 11, 29

Asaf Orr, Esq., et al., National Center for Lesbian Rights, Schools in Transition: *A Guide for Supporting Transgender Students in K-12 Schools* 5, 7 (2015), *available at* http://bit.ly/2kc8Ooi ................................................................ 11, 29

Centers for Disease Control, *Sexual Violence: Facts at a Glance* (2012), http://www.cdc.gov/violenceprevention/pdf/sv-datasheet-a.pdf.................... 34

Christopher Slobogin, *Peeping Techno-Toms and the Fourth Amendment: Seeing Through Kyllo's Rules Governing Technological Surveillance,* 86 MINN. L. REV. 1393, 1420 (2002) ....................................................................... 17

Edward J. Bloustein, *Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser,* 39 N.Y.U. L. Rev. 962, 973-74 (1964) ........................... 40

*EEOC Policy Guidance on Current Issues of Sexual Harassment* ................................ 30

Ferdinand Schoeman, *Adolescent Confidentiality and Family Privacy,* in PERSON TO PERSON 213, 219 (George Graham & Hugh Lafollette eds., 1989)... 16

H.R. 1652, 113th Cong. (2013), https://www.congress.gov/bill/113th-congress/house-bill/1652 ................................. 30

H.R. 848, 114th Cong. (2015), https://www.congress.gov/bill/114th-congress/house-bill/846/related-bills ............. 30

H.R. 998, 112th Cong. (2011), https://www.congress.gov/bill/112th-congress/house-bill/998 .................................. 29

*Random House College Dict.* 1206 (rev. ed. 1980) ........................................................... 29

Restatement (Second) of Torts § 652B (1977) ..................................................................... 39

Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, THE WASHINGTON POST, April 7, 1975 ................................................ 1

S. 1088, https://www.congress.gov/bill/113th-congress/senate-bill/1088 ..................... 30

S. 439, 114th Cong. (2015), https://www.congress.gov/bill/114th-congress/senate-bill/439 ................................ 30

S. 555, 112th Cong., (2011), https://www.congress.gov/bill/112th-congress/senate-bill/555 ................................ 29

Samuel T. Summers, Jr., *Keeping Vermont's Public Libraries Safe*, 34 VT. L. REV. 655, 674 (2010) ........................................................ 16

*The American College Dict.* 1109 (1970) ........................................................ 29

U.S. Dep't of Justice, Civil Rights Division, and U.S. Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter on Transgender Students*, *passim* (May 13, 2016) ........................................................ 2, 28

U.S. Dep't of Justice, Civil Rights Division, and U.S. Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter*, *passim* (Feb. 22, 2017) ................... 28

# INTRODUCTION

As Americans, we enjoy a right to bodily privacy. We have always had separate privacy facilities for men and women, boys and girls, not because we seek to affirm affiliation with other men or with other women, but because of the differences between the two sexes and how that impacts our understanding of modesty, dignity, and an environment free from sexual harassment. Indeed, were differences between the two sexes not the defining factor in privacy facilities, there is no reason for separate spaces. In 1975, when writing a commentary for the Washington Post regarding the proposed Equal Rights Amendment, Justice Ginsburg stated with regard to the contention that restrooms would be opened to both men and women: "Separate places to disrobe, sleep, perform personal bodily functions are permitted, in some situations required, by regard for individual privacy. Individual privacy, a right of constitutional dimension, is appropriately harmonized with the equality principle." Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, THE WASHINGTON POST, April 7, 1975.

In light of our near universal shared understanding of personal privacy in intimate settings like locker rooms, showers, and restrooms, there have been very few cases until quite recently that raise these issues outside of the Fourth Amendment context of searches or correctional or juvenile facilities. Yet even in the complex context of searches and correctional and juvenile facilities where interests in immediate public safety and order come into play, we have recognized those

privacy rights—the right of our bodily privacy against seeing or being seen by someone of the opposite sex. This is all the more true for members of the general public and, in particular, our children whose care we entrust to our schools.

We have recognized a right to bodily privacy from persons of the opposite sex not only under the Fourth Amendment but also the Fourteenth Amendment. *See Doe v. Luzerne County*, 660 F.3d 169, 175-76 n.5 (3d Cir. 2011) (recognizing a Fourteenth Amendment fundamental right to bodily privacy from persons of the opposite sex viewing our partially clothed bodies). Some now seek to deconstruct the meaning of "sex" so that it is no longer grounded in human reproductive nature and objectively confirmable via the biological differences between male and female, but instead means nothing more than our subjective gender identity. Regardless of the attempt by some to manipulate language, our understanding of bodily privacy has always involved a particular sensitivity to the anatomical differences between the sexes. This expectation of bodily privacy is deeply rooted in our traditions, and the governmental violation of such privacy steals our modesty, dignity, and sexual privacy in a way that is inconsistent with ordered liberty.

It is that expectation of bodily privacy from persons of the opposite sex that animated the opposition to the now-rescinded Obama administration letter[1] requiring that access to privacy facilities like locker rooms, showers, and restrooms be regulated by gender identity rather than sex. And bodily privacy is the basis for which the implementing regulations for Title IX preserve separate facilities on the

---

[1] U.S. Dep't of Justice, Civil Rights Division, and U.S. Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter on Transgender Students*, *passim* (May 13, 2016).

basis of "sex," 34 C.F.R § 106.33,[2] a term that has long been understood to mean biological sex. This interest in bodily privacy from persons of the opposite sex can also be found across our laws dealing with such issues as school facility requirements, building codes, and even our understanding of discrimination law. Opening up privacy facilities on the basis of gender identity rather than sex not only violates privacy but also suffers from absolute unworkability since gender identity is non-binary and many genders are neither male nor female.[3]

In addition to sacrificing personal privacy, permitting members of the opposite sex to enter these private spaces also constitutes sexual harassment. Plaintiffs experience loss of dignity, anxiety, stress, humiliation, embarrassment, apprehension, and distress as a result, and can no longer engage in the normal and important activities of using the restroom and changing for physical education class without such feelings due to the presence of members of the opposite sex.

In the instant case, four students of the Boyertown Area School District have brought suit as a result of the school's violation of their fundamental right to privacy, in order to reinstate biologically distinct locker rooms and restrooms. Joel Doe, while changing in the locker room discovered that there was a female behind him, wearing nothing above her waist other than a bra. When he and other students visited the assistant principal to report this incident, the assistant principal told them that they would need to tolerate people of the opposite sex in the

---

[2] *See also Jeldness v. Pearce,* 30 F.3d 1220, 1228 (9th Cir. 1994) (finding that Title IX provides for sex-specific toilet, shower and locker room facilities).

[3] *See* footnote 5 *infra.*

locker room with them and make changing with them as natural as possible. Similarly, Jack Jones, in his underwear in the locker room, discovered a female student near him. Mary Smith encountered a male student in the girls' restroom. Macy Roe fears that she will find herself in the restroom with a boy. As a result of this policy, Mary Smith will not return to Boyertown Area High School next year. Joel Doe may not return either.

Plaintiffs seek a preliminary injunction to protect their right (and that of their fellow students) to personal privacy while using privacy facilities that were designed, pursuant to state law, to be used exclusively by members of one sex.[4]

## FACTS

As set out more fully in the Verified Amended Complaint, Richard Faidley,

---

[4] Throughout this brief, Plaintiffs refer to "sex" as biological sex, which correlates to objective indicia of sex such as chromosomes, gonads, and internal and external genitalia. Sex is objectively verifiable, binary, fixed, and defined by our human reproductive nature as either male or female.

In contrast, "gender" is used consistent with Defendants' policy to mean a self-perception of one's gender that is subjectively discerned and exists along a continuum of an increasing number of genders that exist outside of binary sex. Gender is established only by a person's self-report; there are no objective indicia that disclose one's "gender," and gender identity theory rejects male and female physiological reproductive systems as defining man and woman. Gender is fluid and may be called by any number of names: male, female, or something else as the individual may desire.

Advocates of gender identity theory will often introduce the term "intersex" into briefing, as if being intersex was an example of gender identity playing out. But it is not: intersex refers to a disorder of sexual physiological development in which there is an abnormal chromosomal complement, the development of deformed or ambiguous genitalia, or some combination of the two. Intersex conditions may be objectively diagnosed and are distinct from "genders" proposed by gender-identity theory. Intersex conditions are irrelevant to this action.

Brett Cooper, and E. Wayne Foley, without parent or student notification, authorized multiple students to have unrestricted access to enter and use the privacy facilities of their choice, including those of the opposite sex. V. Compl. ¶¶ 30, 53, 59-60, 88, 111, 125. Neither these men nor the District had informed Joel Doe, Mary Smith, Jack Jones, Macy Roe, or their parents that despite the signs on locker room and restroom doors designating boys' use or girls' use, the District would no longer protect these students' reasonable expectation of privacy, or any person's reasonable expectation of privacy, from viewing or being viewed by members of the opposite sex when they were present in multi-user privacy facilities such as locker rooms, showers, and restrooms. *Id.* ¶¶ 46, 60, 88, 111, 125.

Both male and female students in the school have had their privacy rights violated, and such violations are continuing to occur. Joel Doe had his privacy violated while he was in the boys' locker room in his underwear, when he suddenly realized a female wearing nothing above her waist other than a bra was behind him. *Id.* ¶¶ 50-51. He experienced immediate confusion, embarrassment, humiliation, and loss of dignity upon finding himself in this circumstance and quickly put his clothes on and left the locker room. *Id.* As a result of the policy, he may not return next year. *See* Joel Doe Declaration.

Similarly, the school violated Jack Jones' right to privacy by exposing his body to a member of the opposite sex. Jones began changing in the locker room for PE class, and when he was standing in his underwear about to put his gym clothes on, he saw classmates gesturing and looking at something behind him. When he turned, he saw a female in the locker room with him. *Id.* ¶¶ 86-87. He, like Joel

Doe, experienced immediate confusion, embarrassment, humiliation, and loss of dignity upon finding himself in this circumstance and quickly put his clothes on and left the locker room. *Id.*

One female plaintiff, Mary Smith, discovered a male in the girls' restroom. *Id.* ¶¶ 99-100. She experienced immediate shock, confusion and embarrassment, and reported the incident to the school office, where she learned for the first time that the school was now permitting members of the opposite sex to use the girls' restrooms. *Id.* ¶¶ 104, 107. Mary Smith experiences anxiety, embarrassment, and stress as a direct result of Defendants' practice and actions. *Id.* ¶¶ 113-116. The District's actions have caused her to refrain from using restrooms as much as possible, stress about when and if she can use a given restroom without encountering persons of the opposite sex, and she opts to hold her bladder rather than using the school's restrooms. *Id.* This has caused an ever-present distraction throughout the school day, including during class instructional time. *Id.* Were it not for the District's actions infringing on her right to use girls' restrooms and girls' locker rooms outside of the presence of members of the opposite sex, Mary Smith would have continued going to school at Boyertown next year for her senior year. *Id.* ¶¶ 117-118. Instead, she will not return to school next year if school officials continue to violate her rights by permitting males into females' locker rooms and restrooms. *Id.*

Another female plaintiff, Macy Roe, is distressed that she cannot attend to her personal hygiene without males present. *Id.* ¶¶ 126-128. The anxiety and stress she feels as a direct result of Defendants' practice and actions have caused her to refrain from using restrooms as much as possible, stress about when and if she can use a given restroom without running into persons of the opposite sex, and she now opts

to hold her bladder rather than using the school's restroom. *Id.* This has caused an ever-present distraction throughout the school day, including during class instructional time. *Id.* ¶¶ 128.

The District has violated Joel Doe, Mary Smith, Jack Jones and Macy Roe's reasonable expectation of privacy to be able to use these privacy facilities without members of the opposite sex present. *Id.* ¶¶ 48, 84, 102, 123. Joel Doe, Mary Smith, Jack Jones, and Macy Roe absolutely do not object to students of the same sex using privacy facilities with them regardless of how they may subjectively self-identify their gender, and they have no expectation of privacy from using these privacy facilities with members of the same-sex. *Id.* ¶¶ 49, 85, 103, 124.

As if these privacy violations were not enough for students to contend with, it got worse when the victims respectfully sought relief from the Defendants. When Joel Doe asked whether there was anything that Dr. Foley could do to protect him and other boys from this situation, Dr. Foley responded that he could not do anything at that time and that the boys would have to "tolerate it" and make it as "natural" as they possibly can. *Id.* ¶¶ 54-56. Prior to Joel Doe leaving, Dr. Foley repeated himself a second time, telling him again to be as "natural" as possible. *Id.* ¶ 57. Joel told Jane Doe and John Doe what happened. But when they went to speak with Dr. Cooper about the privacy violation, he spoke condescendingly to them, and told them that if Joel has a problem changing with people of the opposite sex, he can just use the nurse's office. *Id.* ¶ 67.

The marginalization and shaming of Joel Doe did not stop there, however. Just about two days after the incident where Joel's right to privacy was violated, the principal of Berks Career and Technology Center (BCTS), Mr. Jenkins, pulled Joel

Doe out of class to have what Mr. Jenkins called a "casual conversation" about the incident at Boyertown Area High School and stated he wanted "to make sure none of that negativity was going to happen at his school." *Id.* ¶ 70. Joel Doe felt harassed, shamed, and bullied by the District's publication to BCTS about the incident and his concerns. *Id.* ¶ 71. Then Superintendent Faidley weighed in, telling Jane and John Doe that if Joel was uncomfortable changing with those of the opposite sex, or with using the nurse's office, he could just withdraw from school and be home schooled, while still attending vo-tech if he wished. *Id.* ¶ 72.

The District's actions have forced Joel Doe to stop changing for PE class, which has resulted in disciplinary action and poor grades by only receiving half of the day's credit for participating in street clothes rather than gym clothes. *Id.* ¶ 73. Joel stresses about when and if he can use a given restroom without running into people of the opposite sex, and he opts to hold his bladder as much as possible rather than use the school's restrooms. *Id.* ¶¶ 63-64. These daily persistent feelings of anxiety, stress, humiliation, embarrassment, apprehension, distress, and violation of privacy stay with Joel Doe and impact him throughout the day, distracting him from instructional time. *Id.* ¶ 76.

The marginalization and attacks on the dignity of these students was not limited to Joel Doe. When Mary Smith went to the office to inform them that a male was in the female restroom and to ask if her parents were told about this, Dr. Foley told Mary Smith that the District had not told parents about this and he did not offer Mary Smith any other options for her to use restrooms or locker rooms

outside of the presence of male students. *Id.* ¶¶ 109. This pattern of hiding information and pressuring students into further violations of their privacy continued even when some parents got involved. Jack Jones reported to his parents how his privacy was violated when a female saw him in his underwear in the boys' locker room. *Id.* ¶ 89. Jane Jones called Dr. Cooper, who told her that girls who identify as boys are legally entitled to use privacy facilities with her son, and Dr. Cooper never offered any alternative facility to Jack Jones to use. *Id.* ¶ 90.

Defendants created an intimidating and hostile environment for the Plaintiffs, which is having a profoundly negative effect on their access to educational opportunities, benefits, programs, and activities at their schools. Defendants fashioned an ultimatum, telling these students to either give up their right to bodily privacy or stop using the girls' or boys' privacy facilities. In both instances, Defendants are violating Plaintiffs' privacy rights and preventing them from using the facilities that, by state and federal law, are provided for use solely by one sex to ensure that students of one sex have their privacy protected from members of the opposite sex.

## ARGUMENT

"A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Conestoga*

*Wood Specialties Corp. v. Sec'y of the U.S. Dep't of Health & Human Servs.*, 724 F.3d 377, 382 (3d Cir. 2013), *rev'd sub nom on other grounds*, *Burwell v. Hobby Lobby Stores, Inc.*, 134 S.Ct. 2751 (2014) (quoting *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)). Plaintiffs satisfy this standard.

I.  **Plaintiffs Will Likely Succeed on the Merits.**

   A. **The Policy Violates the Fundamental Right to Bodily Privacy from Persons of the Opposite Sex.**

Defendants adopted a policy that separates privacy facilities like locker rooms and restrooms based on students' subjective perception of their own gender rather than, as has been our universal tradition, on the basis of their sex. In doing so, Defendants have transformed those facilities designed to protect persons based on the anatomical differences between the two sexes into places of vulnerability where our children expose themselves and are exposed to persons of the opposite sex in various states of undress. Proponents of the policy suggest this is necessary in order to respect those who identify with the opposite sex.[5] But respect never requires us to

---

[5] A policy that separates our privacy facilities on the basis of gender identity rather than sex also suffers from absolute unworkability. While sex is binary, gender identity is non-binary and often fluid, therefore further deconstructing any logically consistent understanding of male and female. If privacy facilities are to be provided on the basis of gender identity, it necessarily excludes those who describe themselves as neither male nor female or both or fluid or somewhere in between. Furthermore, it also destroys any possibility of maintaining any distinctions in privacy facility use because one person would have the legal right to use any locker room, shower, or restroom based on their self-perception at any given time, since to deny them use of a facility consistent with their sex would be "sex discrimination," but to deny them the use of the opposite-sex's facility would be to engage in "gender identity" discrimination. Further, rather than constituting a binary replacement for biological sex that conveniently dictates which of the two separate facilities we use, gender identity theory defies binary categories and is entirely unworkable for

ignore important distinctions like our differences in anatomy between the two sexes. Nor does a person's prerogative to live out their beliefs about gender justify infringing the fundamental right of privacy.

One has a "constitutionally protected privacy interest in his or her *partially* clothed body." *Luzerne County*, 660 F.3d at 175-76 n.5 (emphasis added).[6] *Accord Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994) (recognizing that the "right to privacy is now firmly ensconced among the individual liberties protected by our Constitution"); *Poe*, 282 F.3d at 138 (recognizing a "right to privacy in one's unclothed or partially unclothed body"). A "reasonable expectation of privacy" exists "particularly while in the presence of members of the *opposite sex.*" *Luzerne County*, 660 F.3d at 177 (emphasis added). "The desire to shield one's unclothed figure from

---

maintaining distinct privacy facilities. *See, e.g.*, American Psychological Association. *Answers to your questions about transgender people, gender identity, and gender expression.* 1-2 (2011), *available at* http://www.apa.org/topics/lgbt/transgender.aspx (explaining that "Genderqueer is a term that some people use who identify their gender as falling outside the binary constructs of 'male' and 'female.'" Other terms "include androgynous, multigendered, gender nonconforming, third gender, and two-spirit people." These "often include a sense of blending or alternating genders. Some people who use these terms to describe themselves see traditional, binary concepts of gender as restrictive."); Asaf Orr, Esq., et al., National Center for Lesbian Rights, Schools in Transition: *A Guide for Supporting Transgender Students in K-12 Schools* 5   (describing gender and gender identity as falling on a "gender spectrum") and 7 (defining "gender identity" as "a personal, deeply-felt sense of being male, female, both or neither") (2015), *available at* http://bit.ly/2kc8Ooi.

[6] The Sixth Circuit located this right in the Fourth Amendment, *see Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008), but this circuit as well as the Second and Ninth Circuit located this right in the Fourteenth Amendment, *see Luzerne County*, 660 F.3d at 176 n.5; *Poe v. Leonard*, 282 F.3d 123, 136-39 (2d Cir. 2002) (locating this right in the Fourteenth Amendment); *York v. Story*, 324 F.2d 450, 454-56 (9th Cir. 1963). But the contours of the right are the same regardless of the constitutional basis. *See Luzerne County*, 660 F.3d at 176 n.5.

views of strangers, and *particularly* strangers *of the opposite sex*, is impelled by elementary self-respect and personal dignity." *York*, 324 F.2d at 455 (9th Cir. 1963) (emphasis added).

Even though the District's policy is unwritten, Defendants apply it expansively: Plaintiffs have seen this policy apply in restrooms and locker rooms, and according to the logic of the policy, it would apply in the showers as well. Students undress in front of each other in these settings. Indeed, Joel Doe and Jack Smith were both in the midst of changing when they saw a girl, and in Doe's case, the girl was wearing nothing above her waist other than a bra. V. Compl. ¶¶ 50-51; 86-87. The right to have a private space to take care of private functions starts at the door of the restroom or locker room. Therefore, Plaintiffs are not afforded their rights to privacy. S*ee Koeppel v. Speirs*, No. 9-902 / 08-1927, 2010 Iowa App. LEXIS 25, at * 16 (Iowa Ct. App. Jan. 22, 2010) (holding that viewing a person in a bathroom would be sufficient to support an intrusion of privacy, even if they aren't viewed on a toilet, because "it is sufficient that the seclusion of the bathroom, a private area, was intruded upon"); *See also, Borse v. Piece Goods Shop, Inc.*, 963 F.2d 611, 621 (3d Cir. 1992) (holding that the collection of urine samples may constitute an invasion of privacy if "it involves the use of one's senses to oversee the private activities of another" since the performance in public of such activities are "generally prohibited by law as well as social custom." Both "visual or aural observation" were of concern.) Both visual and aural observation are implicated by the use of restrooms in Boyertown.

Privacy in restrooms, let alone locker rooms and showers, is paramount. "[M]ost

people have 'a special sense of privacy in their genitals, and involuntary exposure of them in the presence of people of the other sex may be especially demeaning and humiliating.'" *Fortner v. Thomas*, 983 F.2d 1024, 1030 (11th Cir. 1993) (quoting *Lee v. Downs*, 641 F.2d 1117, 1119 (4th Cir. 1981)). That feeling is magnified for teens, who are "extremely self-conscious about their bodies[.]" *Cornfield v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1323 (7th Cir. 1993). Their "adolescent vulnerability intensifies the . . . intrusiveness of the exposure." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 375 (2009). Forcing minors to risk exposing their bodies to the opposite sex is an "embarrassing, frightening, and humiliating" experience. *Id*. at 366. That is why Mary Smith walked out of the restroom in shock after discovering a boy and why both she and Joel Doe may not return next year. V. Compl. ¶¶ 99-100; 113-118; and Joel Doe Declaration.

The Constitution prohibits Defendants from placing students in situations where their bodies or private, intimate activities may be exposed to the opposite sex or where these students will use privacy facilities with someone of the opposite sex. Fundamental rights like these are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty," such that "neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997). It is impossible to conceive of ordered liberty in the midst of the injustice of government pushing or pressuring our children to change clothing, shower, or use the restroom in the presence of the opposite sex. This violates students' dignity, autonomy, and self-respect, and causes them to experience shame, fear, and humiliation. Our history and tradition, along with our concept of ordered

liberty, does not give government such intrusive and demeaning power.

1. **Our History and Tradition: We Actively Avoid Intimate Exposure, Especially for Our Children.**

Defendants' policy conditions use of locker rooms, showers, and multi-user restrooms on students' relinquishment of their right to bodily privacy. But the District may not use its substantial power and influence over those students in its care to condition the use of necessary privacy facilities upon surrendering their fundamental rights. This is a radical departure from our traditions, both in law and practice, of protecting separate spaces between the two sexes where they can perform private or intimate functions and often enter into a various states of undress.

The requirement of separate facilities for men and women is not only found throughout Pennsylvania law[7] but is reflected in our national experience. We

---

[7] Our understanding of personal privacy from persons of the opposite sex is so universal as to require the use of separate facilities on the basis of sex in a myriad of contexts. *See* Public School Code of 1949, 24 P.S. § 7-740 (requiring that privacy facilities "shall be suitably constructed for, and used separately by the sexes"). *See also* 43 P.S. § 109 (requiring application of industrial sanitation code to all employers, which involves separate restrooms); 7 Pa. Code § 1.57 (requiring separate facilities for meat packers); 7 Pa. Code § 78.75 (separate restrooms at eating establishments); 7 Pa. Code § 82.9 (requiring separate facilities on the basis of sex for seasonal farm labor, "distinctly marked 'for men' and 'for women' by signs printed in English and in the native languages of the persons" using those facilities); 28 Pa. Code § 18.62 (requiring "separate dressing facilities, showers, lavatories, toilets and appurtenances for each sex" at swimming pools); 25 Pa. Code § 171.16 (requiring schools to follow the provisions of the Public Bathing Law (35 P. S. § § 672—680d) and 28 Pa. Code Chapter 18 (requiring separate privacy facilities at swimming and bathing places); 28 Pa. Code §19.21 (requiring separate restrooms on the basis of sex at camps); 28 Pa. Code § 205.38 (requiring separate restrooms at long term care facilities); 31 Pa. Code § 41.121 (requiring separate privacy facilities for each sex on railroads); 31 Pa. Code § 41.122 (requiring separate bathrooms to be

recognize "society's undisputed approval of separate public rest rooms for men and women based on privacy concerns. The need for privacy justifies separation. . . ." *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993). When women began working in factories, the law began mandating sex-specific facilities. Massachusetts adopted the first such law, in 1887. *See* Act of Mar. 24, 1887, ch. 103, § 2, 1887 Mass Acts, 668, 669. Later, when public buildings began offering multi-toilet restrooms, they designated one for men and one for women and this became an American norm based on the real and relevant differences between the sexes. This is why "same-sex restrooms [and] dressing rooms" are allowed "to accommodate privacy needs," and why "white only rooms," which have no basis in bodily privacy, are illegal. *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010). Females "using a women's restroom expect[] a certain degree of privacy from . . . members of the opposite sex." *State v. Lawson*, 340 P.3d 979, 982 (Wash. App. 2014). Specifically, teenagers are "embarrass[ed] . . . when a member of the opposite sex intrudes upon them in the lavatory." *St. John's Home for Children v. W. Va. Human Rights Comm'n*, 375 S.E.2d 769, 771 (Vir. 1988).

Students "have a significant privacy interest in their unclothed bodies" at

---

provided for each sex and clearly designated and forbidding any person to use or frequent a toilet room assigned to the opposite sex); 31 Pa. Code § 47.127 (same); 34 Pa. Code § 403.28 (requiring restrooms for each sex); 43 Pa. Code § 41.24 (designating the entrance of "retiring rooms" to be clearly marked by sex and preventing opposite sex entry); 43 Pa. Code § 41.31 (requiring separate toilet rooms "for each sex" which shall be clearly designated and that "no person shall be permitted to use or frequent a toilet room assigned to the opposite sex"); 43 Pa. Code § 41.32 (requiring partitions separating toilet rooms on account of sex, which shall be "soundproof").

school. *Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 604 (6th Cir. 2005). The privacy right is implicated *anytime* the government forces one to undress, but "it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex." *Canedy*, 16 F.3d at 185. Thus, while students may be strip searched by same-sex teachers, opposite-sex teachers may not conduct the search. *Cornfield*, 991 F.2d at 1320. Government cannot force minors to endure the risk of intimate exposure to the opposite sex. "[P]rivacy matters" to children and is "central to their development and integrity." Samuel T. Summers, Jr., *Keeping Vermont's Public Libraries Safe*, 34 VT. L. REV. 655, 674 (2010) (quoting Ferdinand Schoeman, *Adolescent Confidentiality and Family Privacy*, in PERSON TO PERSON 213, 219 (George Graham & Hugh Lafollette eds., 1989)). Allowing opposite-sex persons to view adolescents in restrooms and locker rooms, which exist exclusively so that intimate and private activities can take place, risks their "permanent emotional impairment" under the mere "guise of equality." *City of Phila. v. Pa. Human Relations Comm'n*, 300 A.2d 97, 103 (Pa. Commw. Ct. 1973).

Students' right to privacy explains why a girl's locker room has always been "a place that by definition is to be used exclusively by girls and where males are not allowed." *People v. Grunau*, No. H015871, 2009 WL 5149857, *3 (Cal. Ct. App. Dec. 29, 2009). "Unquestionably, a girls' locker room is a place where a normal female should, and would, reasonably expect privacy, especially when she is performing quintessentially personal activities like undressing, changing clothes, and bathing." *Id.* (recognizing the important privacy rights of a student who was showering, even while wearing a bathing suit). It is that profound recognition of space for privacy

from the opposite sex that inspired the Title IX regulation that provided for privacy facilities to continue to be separated on the basis of sex. *See* 34 C.F.R. § 106.33. That continued norm is why the Kentucky Supreme Court observed that "there is no mixing of the sexes" in school locker rooms and restrooms. *Hendricks v. Commonwealth*, 865 S.W.2d 332, 336 (Ky. 1993).

Our standards with regard to restrooms are consistent with our larger understanding of privacy. Our law has always protected against having one's partially or fully unclothed body unwillingly exposed to the opposite sex or to be exposed to someone else's unclothed body. Civil lawsuits against "Peeping Toms" date from colonial times, *see*, Christopher Slobogin, *Peeping Techno-Toms and the Fourth Amendment: Seeing Through Kyllo's Rules Governing Technological Surveillance*, 86 MINN. L. REV. 1393, 1420 (2002), and personal privacy is also recognized in the context of criminal law, *see, e.g., Livingwell, Inc. v. Pennsylvania Human Relations Com'n*, 606 A.2d 1287, 1289 (Pa. Commw. Ct. 1992) (quoting 18 Pa.C.S.A. § 5901 to make the point that "certain conduct . . . between genders is inappropriate. For example, it is a misdemeanor to commit open lewdness because those who observe it 'would be affronted or alarmed.'"). *See also* 18 Pa.C.S.A. § 7507.1 (regarding viewing or filming a person in a state of undress without their consent in a place where a person "would have a reasonable expectation of privacy"); 18 Pa.C.S.A. § 3127 (regarding the exposure of genitalia in circumstances where a person should know that it "is likely to offend, affront or alarm"). Criminal protections are heightened for children. *See, e.g.,* 18 Pa.C.S.A. § 3127(b) (increasing the severity of an indecent exposure charge based on age). While our courts have

held that pornography involving adults is legal and cannot be banned, it is illegal to possess, distribute, or even view images of naked children. *See* 18 Pa.C.S.A. § 6312. Additionally, nearly every state (including Pennsylvania) has a law criminalizing "sexting," which is when a minor sends a naked picture of himself or herself via electronic means. *See, e.g.,* 18 Pa.C.S.A. § 6321. In sum, the right to bodily privacy historically merited protection over the past centuries and across a broad swath of the law.

    2. **The Policy Infringes Plaintiffs' Fundamental Privacy Rights.**

        a. **Opening Locker Rooms, Showers, and Restrooms to Persons of the Opposite Sex Violates Privacy.**

In order to show respect to all members of our society, we have passed laws to protect the reasonable expectation of bodily privacy from members of the opposite sex in those very few areas where the differences between the sexes is all that matters, such as in privacy facilities. At the same time, where sex is irrelevant, we have passed laws to curb unjust discrimination. The ideal of stamping out discrimination is undermined when we disregard the important differences between men and women and violate their bodily privacy. In *Livingwell*, Pennsylvania courts recognized that employers may hire on the basis of sex to vindicate "a juvenile's 'privacy interest'" that "would be violated if required to . . . disrobe and shower in front of a staff member of the opposite sex." *Livingwell*, 606 A.2d at 1290 (citing *Philadelphia v. Pennsylvania Human Rights Comm'n*, 300 A.2d 97). "[W]here there is a distinctly private activity involving exposure of intimate body parts, there exists an implied bona fide public accommodation qualification which may justify

otherwise illegal sex discrimination. Otherwise . . . such sex segregated accommodations such as bathrooms, showers and locker rooms, would have to be open to the public." *Livingwell*, 606 A.2d at 1291. "The standard for recognizing a privacy interest as it relates to one's body is not limited to protecting one where there is an exposure of an 'intimate area,' but such a right may also be recognized where one has a reasonable basis to be protected against embarrassment or suffer a loss of dignity because of the activity taking place." *Id*. "To hold otherwise would mean that separate changing rooms in factories, mines and construction sites where workers change from street clothes to work clothes and back and where 'intimate areas' are not exposed, would not be permitted." *Id*. at 1293 n.6.

In *Livingwell*, the court upheld a women-only health club since its female customers "assume awkward and compromising positions, and move themselves in a way which would embarrass them if men were present." *Id*. at 1292. The court explained that no intimate area need be exposed or touched in order to afford protection, but instead the women's "modesty" interest was sufficient. *Id*. The court reasoned that "in relation to one's body, there are societal norms, i.e., a spectrum of modesty, which one either follows or respects, and if one is required to breach a modesty value, one becomes humiliated or mortified." *Id*. Testimony in that case established that even exercising in front of men would have been detrimental.

> Psychologically it would be a very unhealthy experience because it would generate anxiety, shame, and embarrassment, and a painful level of self-awareness which is likened to the experience of feeling disfigured or disabled in the sense that one is exposed and vulnerable and there isn't a whole lot that can be done to alter the perception of the observer. It is a very difficult and

stressful experience to be on the spot in that way.

*Id*. at 1293.

The court went on to explain that "[j]ust because 'intimate areas' of these women's bodies are not exposed does not mean that they do not have a privacy interest worthy of recognition. The uncontroverted evidence is that if men were admitted, these women would suffer from extreme embarrassment, anxiety or stress and would not continue to exercise at" the club. *Id*. at 1293 (footnote omitted). Our case is even stronger on this point: unlike the commercial adult customers in *Livingwell*, Plaintiffs are adolescents who are compelled to attend school--and use school-regulated facilities--under the force of law. It is no stretch to say the Plaintiffs should have fully private locker rooms and restrooms and not be put in the vulnerable position of seeking partial shelter behind a curtain or stall door under a standard that opens common areas of a locker room or restroom to any member of the opposite sex. This is all the more true when in Pennsylvania where "[p]rivacy interests are not determined by the lowest common denominator of modesty that society considers appropriate. What is determinative is whether a reasonable person would find that person's claimed privacy interest legitimate and sincere, even though not commonly held." *Id*. at 1293. It is scarcely unreasonable to keep males out of all areas of the girls locker rooms and restrooms, and vice versa. But now at Boyertown, the loss of privacy has affected Plaintiffs' use of restrooms and locker rooms and may result in two Plaintiffs not returning next year. V. Compl. ¶¶ 63-64; 93-95; 113-118; 126-128; Joel Doe Declaration. A third plaintiff,

Macy Roe, is a senior who graduates this year.

As the court explained, some limitations on our sex discrimination laws are appropriate. "Laws forbidding discrimination in hiring on the basis of sex do not purport to erase all differences between the sexes. . . . The biological difference between men and women . . . are the facts that justify limiting personal contact under intimate circumstances to those of the same sex." *Id.* (quoting *City of Philadelphia*, 300 A.2d at 103 n.7). "[T]he purpose of the sex provisions of the Civil Rights Act is to eliminate sex discrimination in employment, not to make over the accepted mores and personal sensitivities of the American people in the more uninhibited image favored by any particular commission or court or commentator." *Livingwell*, 606 A.2d at 1293 (quoting A. Larson, Employment Discrimination Sex § 14.30 (3d Ed. 1980)).

The *Livingwell* court cited the very situation here as manifestly in need of protection. In fact, the situation which Plaintiffs and the other students face is far worse, since they are put in the position of undressing in front of or using the toilet in the presence of persons of the opposite sex. Far from being an issue of discrimination, this case is about protecting children's dignity and personal privacy. Therefore, our fundamental right to bodily privacy must limit the actions of local bodies, like school boards, from enacting policies that violate this interest.

The Supreme Court acknowledged this right to privacy in *United States v. Virginia*, 518 U.S. 515 (1996). The Court ruled that women must be enrolled on equal terms with men at the Virginia Military Institute but also stated that the

school must protect the right to bodily privacy of each student: "Admitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements. . . ." *Id.* at 551.

This understanding of the law was recognized in *Brooks v. ACF Industries, Inc.*, 537 F.Supp. 1122 (S.D. W.Va. 1982), where the court permitted an employer to hire only men as janitors because of the male employees' "privacy rights that would have been violated by a female's entering and performing janitorial duties" in the locker rooms (along with the bath areas and restrooms) "during their use thereof." *Id.* at 1132. "[T]o protect those rights, those male employees were entitled to insist that defendant not assign" someone of the opposite sex to be there. *Id.* The court recognized "the right of the hundreds of male employees who use the three bathhouses" described as locker rooms, showers, and toilet areas "during any given shift not to be required to undress, dress, shower and perform the grosser biological functions in the presence and view of a female engaged in the performance of janitorial duties assigned to her." *Id.* at 1128. It is the same right with regards to persons of the opposite biological sex that is at stake in the present controversy.

Similarly, in *Norwood v. Dale Maint. Sys., Inc.*, 590 F. Supp. 1410, 1415-16 (N.D. Ill. 1984), the privacy violation arising from compelled risk of intimate exposure trumped Title VII's bar on sex-based employment discrimination. Women in men's restrooms, and vice versa, "would cause embarrassment and increased stress" and would be an "extreme" privacy invasion. *Id.* at 1417. The privacy violation caused by encountering an opposite-sex person in one's restroom thus

justified the employer instituting a biological sex requirement for restroom attendants. *Id.* "[T]he presence of unrelated males in [areas] where intimate bodily functions take place is a cause of stress to females." *Torres v. Wis. Dep't of Health & Soc. Servs.*, 859 F.2d 1523, 1531 (7th Cir. 1988) (citation omitted). This is because of the "real . . . differences between men and women." *Id.* at 1527.

Considering the long history of personal privacy, it is not merely Plaintiffs that are concerned. While some students may choose to suffer the embarrassment and frustration caused by the policy rather than fight powerful school administrators who hide the policy from parents and ask students to make it natural, or push back and endure the miseries of peer pressure, that does not excuse violating their rights. Each of those student's rights are violated by this policy that tramples students' dignity interests, strips away modesty and privacy, and leaves them humiliated and vulnerable in privacy facilities. Because the policy infringes on the fundamental right to privacy in one's unclothed body and the right to be free from state compelled risk of exposure to the opposite sex, it is unconstitutional unless it survives strict scrutiny. *See Reno v. Flores*, 507 U.S. 292, 301-02 (1993) (discussing the standard for Substantive Due Process).

b. **Self-identity with the Opposite Sex Does Not Alter the Analysis.**

Opening school locker rooms, showers, and restrooms to persons of the opposite sex violates the privacy rights of all students, not just the ones who are brave enough to take a stand. In a recent case here in Pennsylvania where biological female who identified as a male challenged a school policy barring use of the men's

locker rooms and restrooms, the court recognized the University's interest "in providing its students with a safe and comfortable environment for [using the restroom and locker room] . . . consistent with society's long-held tradition of performing such functions in sex-segregated spaces based on biological or birth sex," *Johnston v. University of Pittsburgh of Commonwealth System of Higher Education*, 97 F. Supp. 3d 657, 668 (W.D. Pa. 2015), as well as in ensuring "the privacy of its students to disrobe and shower outside of the presence of members of the opposite sex." *Id.* at 669. The court noted that, while the question of whether students may use opposite-sex facilities is new, "the applicable legal principles are well-settled." *Id.* at 668. The court approved of "separating students by sex based on biological considerations—which involves the physical differences between men and women— for restroom and locker room use."

Similarly, in the Title VII context, courts have recognized the rights of privacy of restroom users. For instance, the Tenth Circuit found no Title VII violation when a female-identifying male was fired because he used women's restrooms. *Etsitty v. Utah Transit Auth.*, 502 F.3d 1215, 1224 (10th Cir. 2007). The employee argued that "the use of women's restrooms is an inherent part of [his] status [as transgender]." *Id.* But the employee's prerogative to live out their beliefs about gender does not justify violating other people's right to privacy in bathrooms from members of the opposite sex. The court noted other restroom users' interests, and ruled Title VII does not require allowing biological males who identify as female to use the women's restroom. *Id.* The Eighth Circuit concluded likewise in *Sommers v. Budget Mktg., Inc.*, 667 F.2d 748, 748-50 (8th Cir. 1982), finding no Title VII

violation when an employer discharged a man who identified as a female who insisted on using the women's restroom. *Id*. at 748-50. The court agreed that his presence in the women's restroom threatened the female employees' privacy rights. *Id. See also Goins v. West Group, Inc*., 635 N.W.2d 717 (Minn. 2001) (ruling that a state law that parallels Title VII was not violated when an employer refused to allow a man identifying as a woman to use the women's restroom).

Separating restroom and locker room access based on gender identity, as the school has done, rather than protecting the integrity of these facilities on the basis of sex, requires students to attend to intimate bodily needs and change clothing in the presence of opposite-sex persons at a delicate time of life. *See Rider v. Pennsylvania*, 850 F.2d 982, 986 n.6 (3d Cir. 1988). The right to privacy does not permit this outcome.

3. **The Policy Fails Strict Scrutiny.**

Defendants' policy harms Plaintiffs and all students because they are effectively denied use of the locker rooms, showers, and restrooms designed for exclusive use by their sex unless they surrender their fundamental right to bodily privacy. This new policy was foisted upon the students in a way constituting sexual harassment and official bullying, and its continuation flies in the face of our deeply rooted tradition of personal privacy from persons of the opposite sex.

Because the policy infringes a fundamental right, it may only continue if it survives strict scrutiny. Thus Defendants must show that the policy serves a compelling interest and uses the least restrictive means of furthering that interest. *Reno*, 507 U.S. at 301-02.

No compelling interest justifies obligating students to accept members of the opposite sex into locker rooms, showers, and restrooms that are properly reserved to the use of one sex under federal and state law. Indeed, the state's interest is exactly the opposite, as Pennsylvania law governing this school requires that facilities "shall be suitably constructed for, and used separately by, the sexes." Public School Code of 1949, 24 P.S. § 7-740. Defendants' policy violates the requirement of separate privacy facilities and denies Plaintiffs and all students the right to the protections afforded them in using such a sex separated facility, instead conditioning the use of the "boys'" and "girls'" locker rooms, showers, and restrooms on surrendering the right to bodily privacy from persons of the opposite sex. *See also* 25 Pa. Code § 171.7 (requiring separate privacy facilities "for each sex" in schools). *Accord* 22 Pa. Code § 55.2 (same for private elementary schools); 22 Pa. Code § 57.2(a) (same for private secondary schools); 22 Pa. Code § 59.34(a) (same for private special education schools).

Even if there were a compelling interest in endorsing students' gender identity, it is scarcely the least restrictive means to effectuate this through policies that violate student privacy. Our constitution simply does not allow one person's prerogative to live as they wish to result in forcing others to give up rights dear to them. A much more tailored solution to support those who may be uncomfortable using a multi-user facility with others of the same sex would be to provide single-user accommodations. Such accommodations would meet this small number of students' needs without violating the rights of others. Therefore, Defendants have not employed the least restrictive means.

Because the current policy burdens students' right to bodily privacy, serves no compelling interest, and does not employ the least restrictive means, it fails strict scrutiny. Plaintiffs are, therefore, likely to succeed on the merits.

B. **The Policy Violates Title IX by Turning Locker Rooms, Showers, and Restrooms into Sexually Harassing Environments.**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). The District violates Title IX by no longer having locker rooms, showers, and restroom separated on the basis of sex, because allowing biological girls into boys' facilities and biological boys into girls' facilities creates a hostile environment on the basis of sex. Put simply, Defendants' redefinition of the term "sex" in Title IX makes it impossible for the District to comply with the statute.

Title IX protects students' right to an education free from a hostile-environment. A student has a right "to sue a school under Title IX for 'hostile environment' harassment." *Dejohn v. Temple University*, 537 F.3d 301, 316 n.14 (3d Cir. 2008) (quoting *Saxe v. State College Area Sch. Dist.*, 240 F.3d 200, 205-06 (3d Cir. 2000)). "To recover in such a case, a plaintiff must establish 'sexual harassment [ ] that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that [he or she is] effectively denied equal access to an institution's resources and opportunities.'" *Dejohn*, 537 F.3d at 316 n.14 (quoting *Saxe*, 240 F.3d at 205-06). Plaintiffs satisfy

each element.

## 1. Title IX Protections are on the Basis of Sex, Not Gender Identity.

Some schools originally relied on the Obama administration's letter suggesting that Title IX required schools to open privacy facilities on the basis of gender identity rather than on sex. This letter took the position that "sex" under Title IX included gender identity. *See* U.S. Dep't of Justice, Civil Rights Division, and U.S. Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter on Transgender Students*, *passim* (May 13, 2016)). However, the Trump administration rescinded that guidance, pointing out that the former guidance fails to "explain how the position is consistent with the express language of Title IX," U.S. Dep't of Justice, Civil Rights Division, and U.S. Dep't of Educ., Office for Civil Rights, *Dear Colleague Letter*, *passim* (Feb. 22, 2017)), which consistently recognizes that there are two sexes, male and female. The District's policy, like the former guidance, fails to conform with Title IX, which was was created to prevent discrimination on the basis of "sex," a term we have long understood to refer to our biological sex and reproductive nature.

Title IX's language uses the phrases "one sex," "the other sex," and "both sexes."[8] The regulations likewise require that facilities "of one sex" shall be

---

[8] *See*, 28 U.S.C. § 1681(2) (some educational institutions admit "students of both sexes"); 28 U.S.C. § 1681(8) (if certain sex-specific activities are provided "for one sex," reasonably comparable ones must be provided to "the other sex"); 28 U.S.C. § 1686 (authorizing "separate living facilities for the different sexes").

comparable to those for "the other sex." 34 C.F.R. §§106.32-106.33. This language explicitly emphasizes the binary view of sex, not "gender identity," which is nonbinary.[9] Also, dictionaries from when Title IX and its regulations were enacted define "sex" as referring to the physiological distinctions between males and females, particularly with respect to their reproductive functions.[10] Title IX's legislative history leaves no doubt that Congress intended "sex" to mean *biological sex*. Title IX's sponsor stated that the bill would not require co-ed dormitories or locker rooms. *See* 117 Cong. Rec. 30407 (1971). The legislative record also confirms that Title IX allows differential treatment among the biological sexes, such as "classes for pregnant girls . . ., in sport facilities *or other instances where personal privacy must be preserved.*" 118 Cong. Rec. 5807 (1972) (Statement of Sen. Bayh) (emphasis added). Moreover, Congress did not advance a bill that would have created gender identity directives in the educational context.[11] Congress again refused to advance this bill, and the elimination of sex-distinct restrooms and locker

---

[9] See footnotes 4 and 5 *supra*.

[10] *See, e.g.*, *Random House College Dict.* 1206 (rev. ed. 1980) ("either the male or female division of a species, esp. as differentiated with reference to the reproductive functions"); *American Heritage Dict.* 1187 (1976) ("The property or quality by which organisms are classified according to their reproductive functions"); *The American College Dict.* 1109 (1970) ("the sum of the anatomical and physiological differences with reference to which the male and the female are distinguished ..."); 9 *Oxford English Dict.* 578 (1961) ("[t]he sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these.").

[11] H.R. 998, 112th Cong. (2011), https://www.congress.gov/bill/112th-congress/house-bill/998; S. 555, 112th Cong., (2011), https://www.congress.gov/bill/112th-congress/senate-bill/555.

rooms it would lead to in 2013[12] and 2015[13]. The plain language of Title IX, contemporary dictionary definitions, legislative history, and subsequent Congressional inaction on gender identity in schools all communicate that Congress intended to preserve distinct privacy facilities on the basis of sex, not theories of gender identity.

2. **The Policy Subjects Plaintiffs and Other Students to Sexual Harassment.**

Defendants' policy subjects Plaintiffs and other students to an environment where all multi-user locker rooms, showers, and restrooms are designated on the basis of subjective gender identity, thus opening up these facilities to persons of the opposite sex, as Doe, Smith, and Jones have personally experienced. It is well-settled that employers who permit members of the opposite sex into privacy facilities create a hostile environment and constitutes sexual harassment.

The *EEOC Policy Guidance on Current Issues of Sexual Harassment* says the "Commission believes that a workplace in which sexual slurs, displays of 'girlie' pictures, and other offensive conduct abound can constitute a hostile work environment even if many people deem it to be harmless or insignificant."[14] That standard must take on added weight when the Boyertown District replaces a pinup picture with a real female who disrobes in the male locker room. In addition, the

---

[12] H.R. 1652, 113th Cong. (2013), https://www.congress.gov/bill/113th-congress/house-bill/1652; S. 1088, https://www.congress.gov/bill/113th-congress/senate-bill/1088.

[13] H.R. 848, 114th Cong. (2015), https://www.congress.gov/bill/114th-congress/house-bill/846/related-bills; S. 439, 114th Cong. (2015), https://www.congress.gov/bill/114th-congress/senate-bill/439.

[14] https://www.eeoc.gov/policy/docs/currentissues.html.

plaintiffs here are also subject to unconsented exposure of themselves to members of the opposite sex.

The Second Circuit affirmed, in an unreported but instructive case upholding a jury verdict, that a company created a hostile environment when it allowed male cleaners inside the women's locker room while female employees were changing clothes. *See Lewis v. Triborough Bridge & Tunnel Auth.*, 31 F. App'x 746 (2d Cir. 2002). Similarly, the Washington Appeals Court held that, even in the context of a nude dance club, a jury could find a sexually harassing environment where an employer entered into a dressing room and restroom where a waitress was present. *See Schonauer v. DCR Entm't, Inc.*, 905 P.2d 392, 401 (Wash. Ct. App. 1995). Notably, there is no evidence that the waitress was unclothed. And while he was present in the restroom, she was in a stall, but she stated, "His presence made me extremely uncomfortable." *Id*. at 396. The male's presence "intensified" "the hostile and offensive nature of that environment." *Id*. at 401. Mary Smith, Macy Roe, Joel Doe, and Jack Jones are school students. Certainly, schools should not employ policies which leave students less privacy than a waitress gets working in a nude dance club. They deserve to obtain an education at school without being placed in the hostile and offensive environment created by the District.

In *Washington v. White*, 231 F. Supp. 2d 71, 80-81 (D.D.C. 2002), the court held that a female entering the men's locker room "on five to ten occasions," even though the employer had issued a reprimand to the female employee at one point, was sufficient to create a hostile work environment, resulting in sexual harassment. The plaintiff felt "embarrassed and uncomfortable" by the intrusions, one of which

occurred when the female employee entered as he was taking off his shirt. *Id*. at 73.

A reasonable student would find the environment hostile and harassing. "Unquestionably, a girls locker room is a place where a normal female should, and would, reasonably expect privacy, especially when she is performing quintessentially personal activities like undressing, changing clothes, and bathing." *Grunau*, 2009 WL 5149857, at *3. "[A] normal female who was showering in a girls locker room would unhesitatingly be shocked, irritated, and disturbed" if she saw a biological male "gazing at her, no matter how briefly he did so." *Id*.

The same is true for restrooms. A woman's right to bodily privacy does not spring into existence, or cease to exist, depending on what a man believes about the nature of his own internal sense of "gender identity." Her right to bodily privacy is hers and hers alone. Likewise, a man's right to bodily privacy does not exist or cease existing depending on the beliefs or intentions of a woman who seeks to use the men's restroom. Even the act of permitting employees tasked with cleaning a restroom while members of the opposite sex are present, though they are not in the facility to be a voyeur or commit some other crime, would constitute an "extreme" violation of privacy by their presence in that facility. *See Norwood*, 590 F. Supp. at 1417 (noting that opposite-sex persons permitted in restrooms while used by others, even if only to clean, "would cause embarrassment and increased stress in both male and female washroom users" and recognizing "the invasion of privacy that would be created [by the practice] would be extreme"); *Id*. at 1418 (noting that many search for another restroom if an opposite-sex person is present); *Id*. at 1422 (holding that "privacy would be invaded" if women are allowed into men's

restrooms).

Plaintiffs and other students are likewise subject to a hostile environment—and far more frequently than in the cases just cited. Every time they use the locker room or multi-user restrooms, an opposite sex person may be present or enter at any time and intrude upon the privacy of those who are entitled to the privacy protection of their sex-specific facility. In fact, as is the case of the male Plaintiffs, both were in a state of undress with a biological female, and in the case of Doe, the biological female was wearing nothing above her waist other than a bra. Despite Defendants' admonition to make this natural, there is nothing natural about what these students are asked to do. The policy is an extreme violation of privacy, creates a hostile and offensive environment, and causes Plaintiffs and other students suffer humiliation, loss of dignity, stress, apprehension, fear, and anxiety.

### 3. The Harassment Is Based On Sex.

Federal and state law unequivocally contemplates separate privacy facilities for boys and girls, and when persons enter their respective facilities, they are doing so to preserve their privacy. But when a student enters a privacy facility for the opposite sex under the authority of Defendants' policy, that student is not seeking privacy from the opposite sex but to be affirmed in their identification with the opposite sex. It is because the policy specifically provides for students to use the privacy facilities of the opposite sex that students are experiencing harassment. The assistant principal seemed to understand the shocking nature of what he was asking Joel Doe and the other students visiting him to do when he told them to

make using the locker room with a biological girl wearing a bra as natural as possible. *See* V. Compl. ¶¶ 56-57, 61. This harassment has everything to do with sex.

While all Plaintiffs experience humiliation, anxiety, intimidation, fear, stress, and loss of dignity, female Plaintiffs experience added anxiety as a result of feminine changes occurring during adolescence. With the onset of menstruation, girls have feminine hygiene needs that many teenage girls prefer not to share even with those of their own sex. Attending to these needs with males present is humiliating. Also, females are far more likely to be victims of sexual assault than males. A recent study, cited by the Centers for Disease Control, reveals that nearly 12% of high school girls reported having been sexually assaulted.[15] Female Plaintiffs are concerned that, because of the policy, males could enter not because they identify with the opposite sex but to take advantage of the policy for lewd purposes. And because the policy removes the longstanding societal assumption that biological males should not be in girls' facilities, female Plaintiffs cannot even question the presence of a biological male in their locker room or restroom. There is thus no method for excluding males who have lewd intentions until *after* the damage is done. At bottom, this policy harasses students by asking them to share facilities designed for personal privacy from persons of the opposite sex with members of the opposite sex. And while this causes the students to feel vulnerable and violated for a number of reasons, all of those reasons have to do with sex.

---

[15] Centers for Disease Control, *Sexual Violence: Facts at a Glance* (2012), http://www.cdc.gov/violenceprevention/pdf/sv-datasheet-a.pdf.

4. **The Harassment is Severe, Pervasive, and Objectively Offensive.**

"[I]n order for conduct to constitute harassment under a 'hostile environment' theory, it must both: (1) be viewed subjectively as harassment by the victim and (2) be objectively severe or pervasive enough that a reasonable person would agree that it is harassment." *Saxe*, 240 F.3d at 205. Clearly Plaintiffs suffer humiliation, fear, anxiety, stress, and dignity loss caused by the policy, whereby they have experienced persons of the opposite sex in privacy facilities designed for only one sex. Moreover, they fear that they will continue to experience future sexual harassment by finding themselves in similar situations in the future should they use these multi-user facilities. Therefore, Plaintiffs satisfy the subjective prong.

"[T]he objective prong of this inquiry must be evaluated by looking at the 'totality of the circumstances.' 'These may include . . . the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993)). These standards, continuing to reference employment, have been imported into the Title IX context. *See id.* That is why our courts have gone on to restate the "work performance" phrase to read that the harassment "so undermines and detracts from the victims' educational experience, that [he or she is] effectively denied equal access to an institution's resources and opportunities." *Dejohn*, 537 F.3d at 316 n.14 (quoting *Saxe*, 240 F.3d at 205-06). Plaintiffs satisfy this standard.

### a. The Harassment is Frequent and Severe.

Whether harassment is "severe or pervasive" turns on how egregious or frequent the offending conduct is. Conduct need not be *both* severe *and* pervasive. One or the other suffices. Yet both are present here. If Plaintiffs wish to use the locker rooms, showers, or multi-user restrooms, they know that students of the opposite sex may be present or walk in on them. This is not an isolated occurrence that the school has since fixed. This is not a situation of the school passively permitting intrusive behavior initiated by students. Instead, this is now the policy of the school--making it unquestionably pervasive. And it is severe, because school policy dictates that no privacy facility at the school will be exclusively limited to members of one sex. No student should have to change in front of persons of the opposite sex or be in a vulnerable or even exposed state in a restroom with someone of the opposite sex in order to use those facilities.

This violates students' privacy rights and places them at risk of "permanent emotional impairment." *City of Philadelphia*, 300 A.2d at 103; *see also New Jersey Div. of Youth & Family Servs. v. M.R.*, No. A-5931-11T3, 2014 WL 1977014, at *6 (N.J. Super. Ct. App. Div. May 16, 2014) (allowing teen girl to be unclothed and shower with a biological male risked mental and emotional injury).

### b. The Harassment is Threatening and Humiliating.

Every day of the school year, Plaintiffs are denied the use of these facilities unless they face the prospect of being viewed or viewing a person of the opposite sex while attending to personal, private needs, resulting in humiliation, fear, anxiety, stress, and dignity loss. And while the school coerces them to make this humiliation

natural, they are threatened with infringement of their dignity and privacy rights for simply using facilities that are designed to be used exclusively by their sex.

### c. The Harassment Effectively Denies Access to School Resources.

A school is responsible for a victim's harassment, when the harassment "so undermines and detracts from the victims' educational experience, that [he or she is] effectively denied equal access to an institution's resources and opportunities." *Dejohn*, 537 F.3d at 316 n.14 (quoting *Saxe*, 240 F.3d at 205-06). This is undeniably the case here because the school's policy now dictates that Plaintiffs can only use the locker rooms, showers, and restrooms if they are willing to share these spaces with persons of the opposite sex. For this reason, Plaintiffs have been avoiding these facilities and exercising great care to avoid opposite sex persons in those facilities.

While plaintiffs typically must show that those with authority to fix the hostile situation know about it and did not remedy it--that they demonstrated "deliberate indifference" to a third party's improper behavior, *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 290 (1998), here no such showing need be made because the Defendants are being *deliberate and intentional* in authorizing--now by vote of the school board--access to privacy facilities by the opposite sex--which as demonstrated above creates a hostile environment. This is not the typical case involving a situation where a school knows about harassment initiated by one student on another, and the school fails to take appropriate action to bring the student's independent action to a halt. Here, by contrast, it is Defendants themselves that

have officially endorsed a harassing situation on Plaintiffs and the other students by taking away sex-specific privacy facilities and replacing them with facilities separated on the basis of gender identity.

Nor may Defendants escape liability by requiring victims to remove themselves from the environment. A school that responded to allegations of harassment by moving the victim to a different class, rather than addressing the harassment, violated Title IX. *Seiwert v. Spencer-Owen Cmty. Sch. Corp.*, 497 F. Supp. 2d 942, 954 (S.D. Ind. 2007). The District made the same victim-blaming, offensive, and legally fatal error. It refused to protect the sex-based locker rooms, showers and restrooms required by our right to privacy, *see, e.g., Luzerne County*, 660 F.3d at 177, and by state law, 24 P.S. § 7-740; 25 Pa. Code § 171.7. While it initially suggested no other options, the District now offers the nurse's office. Either way, the District's policy hijacks multi-user privacy facilities required by law to protect privacy and misuses them to affirm individuals' subjective gender identities. The District thus effectively prevents Plaintiffs from using the multi-user facilities reserved for use by their sex.

Plaintiffs can no longer use these facilities without subjecting themselves to harassment now created by the school's policy. Conditions of education are altered by increased "tension," making the environment hard to endure. *Dauven v. George Fox Univ.*, No. CV.09-305-PK, 2010 WL 6089077, at *13 (D. Or. Dec. 3, 2010). Plaintiffs avoid using the restroom. *See* V. Compl. ¶¶ 63-64; 93-94, 113-116, 126-127. This causes them discomfort and places them at greater risk for certain infections. Joel Doe has altogether stopped using the boys' locker room because of

the harassment, leaving him without a place to even store his clothes. *Id*. at ¶ 73. Smith is planning to leave the school altogether and pursue her education elsewhere because of the harassing environment. *Id*. at 116-118. Doe may do so as well. *See* Joel Doe Declaration. Plaintiffs easily satisfy their burden of showing that they are denied access to school resources as well as all the other elements of sexual harassment under Title IX.

C.     **The District's Policy is an Intrusion Upon Seclusion.**

The Restatement (Second) of Torts "most ably defines the elements of invasion of privacy as that tort has developed in Pennsylvania." *Id*.

> One who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other person for invasion of his privacy, if the intrusion would be highly offensive to a reasonable person.

Restatement (Second) of Torts § 652B (1977).   Unlike other privacy torts, no publication is required.   *See Borse*, 963 F.2d at 621 (citing *Harris by Harris v. Easton Pub. Co.*, 483 A.2d 1377, 1383 (Pa. Super. Ct. 1984)).   "The tort may occur by (1) physical intrusion into a place where the plaintiff has secluded himself or herself; (2) use of the defendant's senses to oversee or overhear the plaintiff's private affairs; or (3) some other form of investigation or examination into plaintiff's private concerns." *Id*. at 621. The intrusion must "cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *Kline v. Security Guards, Inc.*, 386 F.3d 246, 260 (3d Cir. 2004).

In *Koeppel v. Speirs*, 808 N.W.2d 177, 180 (Iowa 2011), the court explained:

The importance of privacy has long been considered central to our western notions of freedom.

"[A] measure of personal isolation and personal control over the conditions of [privacy's] abandonment is of the very essence of personal freedom and dignity, is part of what our culture means by these concepts. A man whose home may be entered at the will of another, whose conversations may be overheard at the will of another, whose marital and familial intimacies may be overseen at the will of another, is less of a man, has less human dignity, on that account. He who may intrude upon another at will is the master of the other and, in fact, intrusion is a primary weapon of the tyrant."

*Citing*, Edward J. Bloustein, *Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser*, 39 N.Y.U. L. Rev. 962, 973-74 (1964).

Joel Doe and Jack Jones had secluded themselves from people of the opposite sex when they entered and used the locker room and bathrooms, whose signs designated them for use by boys. "There also can be no dispute a bathroom is a place where one enjoys seclusion." *Koeppel*, 2010 Iowa App. LEXIS 25, at * 6; *See also*, *Kohler v. City of Wapakoneta*, 381 F. Supp. 2d 692, 704 (N.D. Ohio 2005) (even where a woman "did not expect privacy from other women in the women-only restroom, she reasonably expected her activities to be secluded from perception by men.") Here, Defendants caused and continue to cause physical intrusions into a place where Plaintiffs and other students in the school seclude themselves, and such intrusion is highly offensive.

While physical intrusion into a place where Plaintiffs seclude themselves is alone enough to support a violation, here the violations also include the second manner of intruding upon another's seclusion, the use of senses to oversee or overhear Plaintiffs' private affairs. *See Borse*, 963 F.2d at 621. In the context of

being viewed by a person of the opposite sex in a restroom or locker room, "[t]here is no question viewing or recording [a person] while in the bathroom would be considered 'highly offensive' by any reasonable person." *Koeppel*, 2010 Iowa App. LEXIS 25, at * 6. The events experienced by Joel Doe and Jack Jones, being viewed in their underwear by a member of the opposite sex, and in Joel Doe's case, also seeing a member of the opposites sex in a state of undress, would be highly offensive to a reasonable person and was highly offensive to both Joel Doe and Jack Jones. Yet this is what Plaintiffs and all students risk occurring in the future under the policy.

The objective offensiveness to the reasonable person is evident in the fact that we have long recognized the right to a private setting, free from persons of the opposite sex in restrooms and locker rooms, which are only made necessary since we often enter into a state of undress or perform private functions therein, which require a buffer from members of the opposite sex that we do not require from members of the same sex. The Public School Code of 1949 requires that facilities "shall be suitably constructed for, and used separately by, the sexes." 24 P.S. § 7-740. Defendants' policy violates the requirement of separate facilities and denies Joel Doe and Jack Jones the right to use such a facility, instead conditioning the use of the "boys'" locker room on surrendering Doe's right to bodily privacy from persons of the opposite sex. *See also* 25 Pa. Code § 171.7 (requiring separate facilities "for each sex" in schools). *Accord* 22 Pa. Code § 55.2 (same for private elementary schools); 22 Pa. Code § 57.2(a) (same for private secondary schools); 22 Pa. Code § 59.34(a) (same for private special education schools). The statutory requirement to

have separate privacy facilities on the basis of sex is a clear recognition and directive by the legislature that privacy from the opposite sex is a fundamental need worthy of protection. *Cf. Harris*, 483 A.2d at 1387 ("statutory ban against disclosing the names of public assistance recipients is a clear recognition and directive by the legislature that the privacy of the recipient is a fundamental need worthy of protection" and "the court is bound to give great deference to this sound legislative judgment").

In *Borse*, 963 F.2d at 621, the Third Circuit noted that aside from visual senses, even hearing the act of urination itself implicates privacy interests and could constitute an intrusion upon seclusion. Additionally, the court explained where the performance of an activity, if performed in public, would be "generally prohibited by law as well as social custom," that would also constitute an intrusion upon seclusion. *Id.* at 621.

All of the above could be said of the situation in which the Defendants placed Plaintiffs. Plaintiffs, as well as many other students, engage in activities, undressing in multi-user locker rooms and using multi-user restrooms, which are generally recognized by social custom to be private, and if performed in public would be considered illegal as well as contrary to social norms.

Joel Doe and Jack Jones were overseen in a privacy facility at the will of another, thus trampling their human dignity by the policy of the District. The District removed Joel Doe and Jack Jones' personal control over the conditions of the abandonment of their own bodily privacy, and in so doing removed the very essence of their personal freedom and dignity. Defendants' actions intruded upon

the Joel Doe's seclusion and Jack Jones' seclusion, and such violations of seclusion will continue to occur for all Plaintiffs and other students unless the Defendant's policy is enjoined.

## II. Plaintiffs Will Suffer Irreparable Harm Without an Injunction of the Policies.

"[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). It is presumed when plaintiffs establish likelihood of success in a case involving privacy rights. *See Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 382 (1st Cir. 1987). *See also Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) ("the right of privacy must be carefully guarded for once an infringement has occurred it cannot be undone by monetary relief"). Plaintiffs suffer humiliation, dignity loss, stress, apprehension, fear, and anxiety because of the policy. The policy has stolen their right to privacy, is altering the conditions of their education by subjecting them to sexual harassment, and constitutes an invasion of seclusion. No final judgment can undo that harm and no amount of money can rectify it.

In respect to Title IX, the irreparable harm question is simply what "injury the plaintiff will suffer if he or she loses on the preliminary injunction but ultimately prevails on the merits, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010). In this context, the inadequacy of the remedy may be demonstrated by showing that "'the particular

circumstances of the instant case bear substantial parallels to previous cases' in which irreparable harm has been found." *Hoop Culture, Inc. v. GAP Inc.,* 648 F. App'x 981, 985 (11th Cir. 2016) (quoting *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1228 (11th Cir. 2008)). Determining whether a case is substantially parallel requires only that the Court "[d]raw[] fair inferences from facts [already] in the record" and consider the nature of the Title IX claims. *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC,* 774 F3d 192, 205 (3d Cir. 2014).

Plaintiffs have been denied access to truly private communal locker rooms and restrooms, which substantially parallels a number of reasonably comparable cases in which irreparable harm has been found. *See, e.g., Doe v. Wood Cty. Bd. of Educ.,* 888 F. Supp. 2d 771 (S.D. W.Va. 2012) (student's involuntary participation in a "completely voluntary" single-sex class was irreparable harm under Title IX); *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck,* 370 F.3d 275, 301–02 n. 25 (2d Cir.2004) (depriving players access to championship playoff was irreparable harm); *Roberts v. Colo. State Bd. of Agric.,* 998 F.2d 824, 833 (10th Cir.1993) (denial of access to play softball was irreparable harm).

Irreparable harm thus arises under all causes of action and a preliminary injunction should issue forthwith.

## III. The Balance of Hardships Sharply Favors the Plaintiffs.

Plaintiffs have established likely merits success on their constitutional right to privacy, sexual harassment under Title IX, and invasion of seclusion. The balance of hardships always favors preventing such violations. *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Only an injunction will stop the

irreparable harm experienced by Plaintiffs. But an injunction does no harm to Defendants because the policy is unconstitutional and illegal, and the government is not harmed when it is prevented from enforcing unconstitutional and otherwise illegal laws. *See Joelner v. Village of Wash. Park*, 378 F.3d 613, 620 (7th Cir. 2004).

Moreover, issuing an injunction would restore the status quo of protecting student privacy via truly sex-separated privacy facilities and thereby effect a legal interest in privacy that is wholly consistent with Title IX and the referenced state and federal law. The balance of hardships favors Plaintiffs.

IV. **The Public Interest Favors a Preliminary Injunction.**

"[T]here is the highest public interest in the due observance of all the constitutional guarantees[.]" *United States v. Raines*, 362 U.S. 17, 27 (1960). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *G & V Lounge, Inc. v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994). It is also in the public interest to prevent the government from "violat[ing] the requirements of federal law," *Ariz. Dream Act Coal.*, 757 F.3d at 1069, such as Title IX. Because Plaintiffs established likelihood of success in these privacy claims, public policy favors the granting of a preliminary injunction.

V. **Plaintiffs Respectfully Request this Court Waive Bond Requirements Under Rule 65(c).**

Waiving the bond requirement is warranted because Plaintiffs seek to vindicate constitutional and statutory rights, and so their lawsuit is in the public interest. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 804 n.8 (3d Cir. 1989) (collecting cases); *Powelton Civic Home Owners Ass'n v. Dep't of*

*Housing and Urban Development*, 284 F. Supp. 809, 840 (E.D. Pa. 1968); *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084, 1094 (5th Cir. 1981) (noting that courts have recognized that public interest litigation is an exception to the Rule 65 bond requirement); *Crowley v. Local No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers*, 679 F.2d 978, 1000 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984) ("no bond is required in suits to enforce important federal rights or public interests.") (quotation marks omitted).

Waiving the bond requirement here is particularly appropriate because Plaintiffs raise important claims that serve the public interest by vindicating students' constitutional and statutory rights. Imposing a bond requirement here would be especially inequitable given Defendants' patently unlawful actions and Plaintiffs' strong likelihood of success on the merits. This conclusion is bolstered by the fact that neither Defendants nor anyone else will suffer harm – financial or otherwise – by this Court's enjoining the offending policy.

## CONCLUSION

Defendants' policy violates the right to privacy, constitutes sexual harassment and an invasion of seclusion, and violates state law. The only reason for separate privacy facilities are the differences between the two sexes. Moreover, Defendants' policy is entirely unworkable because gender identity theory is non-binary and therefore cannot dictate which of the two separate privacy facilities we

use. For the foregoing reasons, Plaintiffs respectfully request that the preliminary injunction issue.

Respectfully submitted this 17th day of May, 2017.

By: /s/ Randall L. Wenger

CATHY R. GORDON, PA 56728*
JACOB KRATT, PA 316920
**LITCHFIELD CAVO LLP**
420 Fort Duquesne Blvd., Suite 600
Pittsburgh, PA 15222
412-291-8246
412-586-4512 Fax
gordonc@litchfieldcavo.com
kratt@litchfieldcavo.com

RANDALL L. WENGER, PA 86537
JEREMY L. SAMEK, PA 205060
**INDEPENDENCE LAW CENTER**
23 North Front St.
Harrisburg, PA 17101
(717) 657-4990
(717) 545-8107 Fax
rwenger@indlawcenter.org
jsamek@indlawcenter.org

JORDAN LORENCE, MN 0125210**
KELLIE FIEDOREK, DC 1015807 FL
74350***
CHRISTIANA HOLCOMB, CA 277427***
**ALLIANCE DEFENDING FREEDOM**
440 First St. NW, Suite 600
Washington, DC 20001
(202) 393-8690
jlorence@ADFlegal.org
kfiedorek@ADFlegal.org
cholcomb@ADFlegal.org

GARY S. MCCALEB, AZ 018848***
**ALLIANCE DEFENDING FREEDOM**
15100 N. 90th St.
Scottsdale, AZ 85260
(480) 444-0020
(480) 444-0028 Fax
gmccaleb@ADFlegal.org

*Application for Admission Forthcoming
**Pro Hac Vice Application Forthcoming
***Admitted Pro Hac Vice

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on Wednesday, May 17, 2017, the foregoing

was filed electronically and served on the other parties via the court's ECF system.

The undersigned hereby certifies that counsel for Plaintiffs has also delivered an

electronic copy of the foregoing to counsel for Defendants and is sending the same

by regular mail to:

David W. Brown, Esq.
LEVIN LEGAL GROUP, P.C.
1301 Masons Mill Business Park
1800 Byberry Road
Huntingdon Valley, PA 19006
dbrown@levinlegalgroup.com

/s/ Randall L. Wenger
Randall L. Wenger
INDEPENDENCE LAW CENTER
23 North Front St.
Harrisburg, PA 17101
rwenger@indlawcenter.org