# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOEL DOE, *et al.*, <br><br>    Plaintiffs, <br><br>v. <br><br>BOYERTOWN AREA SCHOOL DISTRICT, <br><br>    Defendant, <br><br>and <br><br>PENNSYLVANIA YOUTH CONGRESS FOUNDATION, <br><br>Defendant Intervenor. | **Case No. 5:17-CV-01249-EGS** <br><br> **The Honorable Edward G. Smith** |

**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION TO STAY PROCEEDINGS PENDING RESOLUTION OF APPEAL IN *BOSTOCK v. CLAYTON COUNTY*, *ALTITUDE EXPRESS, INC. v. ZARDA*, AND *R.G. & G.R HARRIS FUNERAL HOMES v. EEOC***

## MEMORANDUM OF LAW

### I. PROCEDURAL HISTORY

After the August 25, 2017, Order of this court denying Plaintiffs' Motion for Preliminary Injunction, Plaintiffs appealed. On April 6, 2018, the Third Circuit added Plaintiffs James Jones and Chloe Johnson, who are now a rising sophomore and rising senior at Boyertown. The Third Circuit Court of Appeals denied Plaintiffs' motion on May 24, 2018, and issued a final order on July 26, 2018. Plaintiffs filed a petition for certiorari on November 19, 2018, which was denied on May 28, 2019.

### II. SUMMARY OF ARGUMENT

A stay is particularly appropriate at this stage in the case, as the Supreme Court is poised to answer the question of what "sex" means under federal nondiscrimination law. Does it mean the unchangeable objective status of being male or female as grounded in human reproductive nature as Plaintiffs argue, or does "sex" include gender identity, such that a person of one sex can demand to be treated under the law as if they are wholly a member of the opposite sex, as the District and Intervenors argue?

With the law clear, the parties will better know what facts and strategies to bring to bear to litigate this case in a logical, efficient manner. Lacking that, the parties will either over or under-serve the Court by having to guess at the factual

development needed and degree of expert witness involvement. Such prudence prejudices no one and minimizes the overall burden on judicial resources. If the high Court holds that "sex" refers to male/female status as determined by reproductive anatomy, the case may be well positioned for summary judgement without substantial further factual development. Conversely, if the Court holds that "sex" includes the malleable continuum of genders, then extensive factual development (including experts) would be needed. Staying the case pending this critcial clarification of what "sex" means would guide the parties and inform this Court's legal analysis as to the very key term in this case: "sex."

### III.  ARGUMENT

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the cases on its docket with economy of time and effort for itself, for counsel, and for litigants.  How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance."  *Landis v. North American Co.*, 57 S. Ct. 163 (1936) (*citing Kansas City Southern Ry. Co. v. United States*, 51 S. Ct. 304 (1931)).  "[A] United States district court has broad power to stay proceedings." *Bechtel Corp. v. Laborers' International Union*, 544 F.2d 1207, 1215 (3d Cir. 1976).  "In the exercise of its sound discretion, a court may hold one lawsuit in abeyance to abide the outcome of another. . . ." *Id.*

The present circumstances warrant a stay because the outcome of *Bostock v.*

3

*Clayton Co.*, *cert. granted*, 139 S. Ct. 1599 (2019), *Altitude Express, Inc. v. Zarda*, *cert. granted*, 139 S. Ct. 1599 (2019), and *R.G. & G.R. Harris Funeral Homes v. EEOC*, *cert. granted*, 139 S. Ct. 1599 (2019), will substantially affect or be dispositive of the issues before this court. In that light, considerations of judicial economy — this Court's time and effort, and that of the litigants and their counsel — militate strongly toward temporarily staying the case.

### A. The *Bostock*, *Zarda*, and *Harris Funeral Homes* cases will answer, or give clarity to, the central legal issues before this Court.

Both of the Plaintiffs' federal claims turn on the meaning of the word "sex," and by extension the meaning of "opposite sex," which the Third Circuit recognized in the very first sentence of its analysis: "Because such seemingly familiar terms as 'sex' and 'gender' can be misleading in the context of the issues raised by this litigation, we will begin by explaining and defining relevant terms." *Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 522 (3d Cir. 2018), *cert. denied,* No. 18-658, 2019 WL 2257330 (U.S. May 28, 2019).

The constitutional right to bodily privacy claim turns on the meaning of "sex" because the right to bodily privacy is most pronounced with respect to the opposite sex. *See* discussion *infra,* Part A.2. With the Title IX claim, the Third Circuit's functional understanding of the meaning of sex colored its analysis on what is a "hostile environment."

4

In *Harris Funeral Homes*, 139 S. Ct. at 1599, the Court will answer whether "Title VII prohibits discrimination against transgender people based on (1) their status as transgender or (2) sex stereotyping under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989)." The *Bostock* and *Zarda* cases will answer "[w]hether discrimination against an employee because of sexual orientation constitutes prohibited employment discrimination 'because of . . . sex' within the meaning of Title VII of the Civil Rights Act of 1964." *Bostock v. Clayton County, Ga.*, *petition for cert. filed*, No. 17-1618, 2018 WL 2456150 (U.S. May 25, 2018). *See also Altitude Express, Inc. v. Zarda*, *petition for cert. filed*, No. 17-1623, 2018 WL 2558416 (U.S. May 29, 2018) (similar). These questions will inform this Court as to what the word "sex" means.

Clarity is needed because throughout its opinion, the Third Circuit blurred the line between sex and gender, by declining to use the word "sex" unless accompanied by a phrase like "as determined at birth," implying that "sex," by itself, is ultimately determined by gender identity rather than reproductive physiology. Indeed, during argument, one judge expressed difficulty understanding the phrase "opposite sex," stating that the term "complicates the discussion," insisting that there can only be clarity through the use of the phrases "transgender boy" and "transgender girl." Oral Argument Audio at 4:12[1] Similarly, when

---

[1] *Available at* https://www2.ca3.uscourts.gov/oralargument/audio/17-3113Doev.BoyertownAreaSch

5

discussing Plaintiffs' privacy conflicts arising from sharing spaces with the opposite sex, the court continually nuanced that claim, using phrases like Plaintiffs "understood was of the opposite biological sex," as if Plaintiffs' recognition of opposite sex is somehow merely their subjective assessment. *Boyertown*, 897 F.3d at 529. The entire operative assumption behind the court's opinion turns on the nature of sex and whether "sex" and "opposite sex" in statute or case law are subsumed by or trumped by gender identity. It is that very same question: whether "sex" includes gender identity, that is at issue in *Harris Funeral Homes*.

As a result of conflating sex with gender identity, the court characterized Plaintiffs' claims as merely subjectively derived: "To the extent that the appellants are expressing discomfort being around students *whom they define* as different from themselves, that discomfort does not implicate a privacy interest. . . ." *Boyertown*, 897 F.3d at 529 n.69. (emphasis added).[2]

Sex is not a mere subjective assessment. But, this is how the Third Circuit treated the term throughout its Opinion. In other words, the court's analysis worked under the assumption that "sex" is more expansive than biological sex, which allowed the court to find it appropriate to allow biological male in a female

---

oolDist.mp3. The court even went so far as to insist that the phrase "opposite sex" should be jettisoned. *Id*. But such language is necessary as caselaw and statute are built on an understanding of these concepts that are now being blurred.

[2] See also page 531, where the court similarly discounts the sex of the students by using the phrase, "*whom appellants identify* as being members of the opposite sex." (emphasis added).

restroom, and vice versa. And with regard to the present motion, that issue can be expected to be resolved by the three Title VII cases. Should the Supreme Court interpret "sex" to mean biological sex, and nothing more, the premise upon which the Third Circuit's opinion rests is substantially changed.

### 1. *Harris* will give guidance as to the meaning of *Price Waterhouse*.

*Harris* is also particularly important in that it not only addresses whether the subjectively-defined transgender status is protected under Title VII, but directly asks whether sex stereotypes are categorically protected under *Price Waterhouse*. That theory is so essential to the school's position that it used a half-page single-spaced string cite to bolster its position that sex stereotyping (alternately denoted "gender nonconformity") was a protected characteristic. *See* Defs' Memo. in Opp. to the Mot. for Prelim. Inj. at 21 n.12 (ECF No. 34) (listing authorities). A Supreme Court holding to the contrary would substantially weaken the school's case.

Intervenor Defendants' theory is similarly grounded in the sex-stereotyping theory that directly emerges from misreading *Price Waterhouse*. In opposing the preliminary injunction motion, Intervenors cited to *Glenn v. Brumby*, 663 F.3d 1312, 1316-18 (11th Cir. 2011), *see* I-D Resp. in Opp. to Plfs' Mot. for Prelim. Inj. at 15 (ECF No. 33), and *Glenn* directly relies on *Price Waterhouse*. *See Glenn*, 663 F.3d at 1316 (grounding the definition of "transgender" in *Price Waterhouse* stereotyping

theory). Then the Intervenors cited to *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1048 (7th Cir. 2017), for the proposition that discrimination on gender non-conformance violates Title IX. *See* I-D Resp. in Opp. to Plfs' Mot. for Prelim. Inj. at 15. And *Whitaker* adopted that theory from *Price Waterhouse* and *Glenn*. *See Whitaker*, 858 F.3d at 1047-1049 (tracing development of sex-stereotyping theory). The Intervenor then cites *Evancho v. Pine-Richland Sch. Dist.*, 237 F. Supp. 3d 267, 285 (W.D. Pa. 2017), as establishing protection for transgender status, *see* I-D Resp. in Opp. to Plfs' Mot. for Prelim. Inj. at 15, but *Evancho* turned directly to *Glenn* for its authority. *Evancho*, 237 F. Supp. 3d at 285.

Unsurprisingly, Plaintiffs have countered these arguments, first explaining that *Price Waterhouse* was inapposite. Reply Br. in Supp. of Pls' Mot. for Prelim. Inj. at 3, n.4 (ECF No. 36). Then, as the *Price Waterhouse* sex-stereotyping theory emerged as a keystone argument for Defendants, Plaintiffs' explained in detail that sex stereotyping theory wrenched from *Price Waterhouse* was no grounds for redefining "sex." Reply Br. for Appellants at 11-14, *Doe v. Boyertown*, No. 18-658 (3d Cir. Nov. 14, 2017). In sum, whether *Price Waterhouse* created a new protected class for gender nonconformance/transgender status outside the text of Title VII is at the bedrock of this case. And with the Supreme Court specifically granting *certiorari* to decide what *Price Waterhouse* means, it would be most prudent to let that Court

speak before deciding this case.³

### 2. The application of the right to bodily privacy hinges upon the definition of "sex."

The Third Circuit in this case recognized that there is "a right to privacy in a person's unclothed or partially clothed body," which it based on the expectation of privacy it recognized in *Doe v. Luzerne County*, 660 F.3d 169, 175 (3d Cir. 2011). *See Boyertown*, 897 F.3d at 527 n.53. And that right is at stake "particularly while in the presence of members of the opposite sex." *Luzerne County*, 660 F.3d at 177.

Not only does *caselaw* applying this right rely on an objective understanding of "sex" or "opposite sex," *id.*; *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963) ("The desire to shield one's unclothed figure[] . . . particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity."), but also Pennsylvania's specific law applicable to privacy facilities in schools makes clear there is an expectation of privacy that turns on sex. It states that facilities where students may toilet "shall be suitably constructed for, and used separately by, the sexes." 24 P.S. § 7-740. As a result, students have a right to expect that those using such facilities with them are the same sex. Again, this presupposes an understanding of what "sex" is — and understanding that will be made more clear following the

---

³ It is foreseeable that the Court would limit the holding of *Price Waterhouse*, becuase the repurposing of that case to create new protected classes in that way is at odds with the Court's recognition of sex as grounded in reproductive anatomy as exemplified by *United States v. Virginia*, 116 S. Ct. 2264 (1996), *Nguyen v. INS*, 533 U.S. 53 (2001), and *Frontiero v. Richardson*, 411 U.S. 677 (1973).

Supreme Court's examination of that term in the context of federal law.

If the Supreme Court concludes that "sex" exclusively means biological sex, that will call into question the Third Circuit's analysis in this case, which turned on a much more maleable definition. The Third Circuit, for instance, described Plaintiffs' assertion that they were sharing these spaces with the opposite sex as merely a subjective assessment. *See Boyertown*, 897 at 531 ("Thus, we are unpersuaded to the extent that the appellants' asserted privacy interest requires protection from the risk of encountering students in a bathrooms or locker room *whom appellants identify* as being members of *the opposite sex*.") (emphasis added). If the Supreme Court determines "sex" to mean biological sex, it would not merely be Plaintiffs who identify those students "as being members of the opposite sex," but this Court's analysis would turn on that understanding as well — an understanding that sex is objectively determined and discerned and not established by even deeply held feelings about one's own gender.

In the same vein, the Third Circuit goes on to say that a "transgender student's presence in the restroom provides no more of a risk to other students' privacy rights than the presence of an overly curious student of the same biological sex who decides to sneak glances." *Id*. Yet there are very different legal ramifications of a male, whether curious or uncurious, entering a female facility precisely because it is an opposite sex student that is entering those spaces. If sex

for pupues of caselaw and statutory interpretation is viewed expansively in the three pending Supreme Court cases, the Third Circuit's view that an objective analysis of sex will mean little in such spaces may stand. But this serves as further evidence that the Third Circuit based all of its conclusions on a premise that sex (if not modified by "biological") means gender identity. That's precisely why we should wait for further clarity on the law. A final determination on the right to privacy cannot be answered until a firm legal answer to that fundamental question is achieved through the trio of cases pending before the Supreme Court.

### 3. The definition of "sex" will instruct the Court as to whether "sex" is replaced by gender identity within a Title IX hostile environment analysis.

"Title IX's 'hostile environment harassment' cause of action originated in a series of cases decided under Title VII. . . . Title VII cases are therefore instructive." *Boyertown*, 897 F.3d at 534. With three such cases speaking to the meaning of "sex," the resulting holdings will be exceptionally instructive to this case's understanding of the term.

The Third Circuit improperly framed the Plaintiffs' hostile environment claim because of its misunderstanding of sex and opposite sex. By framing the problem as "*transgender* students in bathrooms and locker rooms constitut[ing] sexual harassment," the Third Circuit rejected the assertion that Plaintiffs are "effectively denied equal access to an institutions resources and opportunities."

*Boyertown*, 897 F.3d at 535 (emphasis added). However, Plaintiffs' argument had nothing to do with how their fellow students identified (as they welcomed transgender students into privacy facilities with them if they were the same sex), but had everything to do with the students' sex.

These differences in approach reveal the differences in presuppositions. The Third Circuit rightly recognized that a hostile environment claim requires severe, pervasive, and objectively offensive acts. However, the Court determined that "a transgender individual in a bathroom did not create a hostile environment because there was no evidence that the individual 'engaged in any inappropriate conduct other than merely being present in the women's faculty restroom.'" *Id*. at 536 (*quoting Cruzan v. Special School Dist., No. 1*, 294 F.3d 981, 984 (8th Cir. 2002)). However, the Court no doubt would have found that the presence of teen boys who identify as boys in the girls' locker room as inappropriate, severe, pervasive, and/or objectively offensive. And, again, there is no doubt the boys would not have needed to do any further bad act. Their mere presence is inappropriate, just as it would be inappropriate for a male coach to walk into a girls' locker room while it was in use. This is for obvious reasons, which is that males and females have patent differences that require separation for privacy. And girls' complaints with the boys' presence would not be chided as discriminatory, because it is clear under those facts why we have separate facilities. The only way the Court reached its conclusion was by

12

essentially replacing sex with gender identity. Should the trio of Supreme Court cases determine that sex does not mean gender identity, the premise upon which the Court based its opinion would necessarily change.

**B.     It is in the interest of judicial economy to stay this matter.**

Plaintiffs anticipate another round of discovery, expert witnesses, additional depositions, motions, and a trial. In addition to expert discovery, two additional Plaintiffs had been added during the appeal, a rising sophomore and a rising senior, which may necessitate additional factual development.

By the time all of this has occurred, the three cases at the Supreme Court will likely have already been argued and would be at or near a decision. In the meantime, all the parties will be litigating in the same confused legal context which led the Supreme Court to take not one or two cases, but three that bear on the meaning of sex and will directly clarify *Price Waterhouse's* stereotyping language. It would be much more efficient to know the law from the outset, then litigate, or even choose not to further litigate, accordingly.

**C.     No parties are prejudiced by staying the proceedings.**

Boyertown Area School District would not be prejudiced as a result of a stay because, with the preliminary injunction having been denied, the school can continue to enforce its chosen policies. Similarly, the Intervernor's associational interests are not prejudiced: transgender students are able to use the privacy

facility of their choosing. Any delay of this litigation will not disrupt Defendant or Intervenor in any way.

## IV. CONCLUSION

In conclusion, the Plaintiffs respectfully request that this Court stay these proceedings until the *Bostock*, *Zarda*, and *Harris Funeral Home* cases have been decided.

Respectfully submitted this 17th day of June, 2019.

By: /s/ Randall L. Wenger

CATHY R. GORDON, PA #56728
Litchfield Cavo, LLP
420 Fort Duquesne Blvd., Suite 600
Pittsburgh, PA 15222
(412) 291-8246
(412) 586-4512 fax
gordonc@litchfieldcavo.com

KELLIE FIEDOREK, DC #1015807*
CHRISTIANA HOLCOMB, CA #277427*
Alliance Defending Freedom
440 First St. NW, Suite 600
Washington, DC 20001
(202) 393-8690
kfiedorek@ADFlegal.org
cholcomb@ADFlegal.org

RANDALL L. WENGER, PA #86537
JEREMY L. SAMEK, PA #205060
Independence Law Center
23 North Front Street
Harrisburg, PA 17101
(717) 657-4990
(717) 545-8107 fax
jsamek@indlawcenter.org
rwenger@indlawcenter.org

GARY S. MCCALEB, AZ #018848*
Alliance Defending Freedom
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
(480) 444-0028 fax
gmccaleb@ADFlegal.org

*Admitted *Pro Hac Vice*

ATTORNEYS FOR PLAINTIFFS